**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| HEAVENLY BRANDY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 2:22-CV-70-PPS |
| | ) | |
| | ) | |
| THE CITY OF EAST CHICAGO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>OPINION AND ORDER</u>

On the morning of August 11, 2021, Heavenly Brandy was riding in the front passenger seat of a Chevrolet Impala when it collided with an East Chicago police SUV. What happened in the seconds after that collision is the heart of this dispute. East Chicago Police Officer Gustavo Garcia stepped out of the SUV and fired multiple rounds into the Impala with his service pistol. Three of those rounds struck Brandy—who was unarmed, was not the driver, and by her account had her hands in the air. One round struck the driver in the neck, and another ripped through the headrest of an uninvolved driver. Garcia says he opened fire because the Impala was accelerating forward, its engine revving, threatening to crush the leg of his partner, who was pinned between the two vehicles as he attempted to exit the passenger side. Brandy says the Impala was stopped and going nowhere, its occupants surrendering with their hands up, when Garcia began firing through the window. Both versions cannot be true.

Brandy sued Officer Garcia under 42 U.S.C. § 1983 and the City of East Chicago

1

under state tort law. (Brandy abandoned her claim against "Unidentified East Chicago Police Officers".) [DE 128 at 19-20.] Both defendants now seek summary judgment. [DE 111; DE 115.] The motions will be denied because the decisive fact—whether the Impala was a moving threat when Garcia fired—is genuinely disputed, and that dispute runs through nearly every argument that defendants make.

## Background

<u>The Traffic Stop</u>

The chain of events began with Officer Mitchell Tipton. According to the defendants, Officer Tipton watched the driver of the Impala (later identified as Charles Winston) run a stop sign, turn into an alley, and then accelerate away northbound on Indianapolis Boulevard. A check of the plates came back stolen, and Officer Tipton relayed to Officer Andres Verduzco by cell phone that the car was "taking off" and "had come back stolen." [DE 113 at 2; DE 117 at 2.] Brandy, who sat on the passenger side, tells it differently. She testified that she did not see Winston commit any driving infractions that day. [DE 123-5 at 50, 52.]

Officer Verduzco was a field training officer riding with Officer Garcia, who was then a probationary officer. [DE 113 at ¶9.] While both defendants say in their papers that Verduzco passed along Tipton's information [DE 113 at ¶8; DE 117 at ¶42], Officer Garcia testified that he believed they were assisting with just a traffic stop involving "fictitious plates or something like that." [DE 122-2 at 5.] For his part, the training officer, Officer Verduzco, confirmed that he did not relay to Officer Garcia what Tipton was telling him on the phone. [DE 122 at 14; DE 123 at 6.]

2

The Collision

The parties' description of what took place during the collision differs. Per the defendants, as Garcia pulled up, the Impala "appeared to accelerate and slammed into the patrol car," catching Officer Verduzco's right leg as he was exiting the passenger side of the vehicle. [DE 113 at 2; DE 117 at 8.] Brandy disputes that Winston rammed his car into the police vehicle. She says Officer Garcia drove his SUV across oncoming traffic, nearly head-on into the Impala's path. [DE 122, Resp. to ¶48.] Winston was focused on the lit-up squad car behind him and couldn't avoid Garcia's SUV by the time he noticed it in front of him. [DE 122-5 at 3.]

The Shooting

The defendants say that after the collision the Impala kept accelerating, hard enough to shake the squad car, and Verduzco screamed with his leg pinned between the cars. [DE 113 at ¶¶ 13-15; DE 117 at ¶¶ 58-62.] Brandy, on the other hand, says the vehicle did not continue to accelerate or rev after the collision. [DE 122, Resp. to ¶59.] She points to video evidence of the scene as proof that the vehicle was stopped. [DE 128 at 1; DE 122 at ¶105.] What's more, Glen Weaver, a driver who stopped in the adjacent lane, testified that the Impala did not accelerate or move after the collision. [DE 122 at ¶¶ 105, 117; DE 135, Resp. to ¶117.]  Winston and Brandy testified the same [DE 122-5 at 9; DE 122-6 at 21], and both said they put their hands up in surrender before the shooting began. [DE 122-6 at 21; DE 122-5 at 4.]

Whether Officer Garcia knew Brandy was in the car is also disputed. Garcia says he learned of her only "after the fact." [DE 117 at ¶72.] Brandy responds that the cars

3

faced each other before the collision, that the Impala's front windshield was not tinted, and that Verduzco could see through it well enough to describe Winston's facial expression. [DE 122 at ¶ 109, Resp. to ¶72]

Whether he could see her or not, Officer Garcia fired his service pistol several times and in the process he struck Brandy three times. [DE 122 at ¶114.] She then climbed into the back seat, got out through the rear door, and lay face down on the pavement. [DE 122 at ¶¶ 112-113.]

The Aftermath and This Lawsuit

Six days later, on August 17, 2021, Brandy's counsel sent certified letters to East Chicago's mayor, corporate counsel, and police chief stating that the shooting was likely to be the subject of litigation and demanding the preservation of evidence. The return receipts show delivery on August 20, 2021. [DE 122, Resp. to ¶84.] Whether those letters satisfy Indiana's Tort Claims Act is a question I take up below.

Brandy filed this suit on March 24, 2022. [DE 1.] Her complaint pleads four counts: excessive force under 42 U.S.C. § 1983 (Count I against Garcia and other unidentified officer defendants), failure to intervene (Count II against officer defendants), and Indiana common-law assault and battery (Counts III and IV against the City of East Chicago). [*Id*.] As noted above, Brandy no longer pursues her failure-to-intervene claim, and she has confirmed, consistent with her Complaint, that her assault and battery claims are against the City only, not Garcia. [DE 128 at 18-20.]

**Standard of Review**

Summary judgment must be granted when "there is no genuine dispute as to any

4

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (citation omitted). On a motion for summary judgment, all facts and reasonable inferences are construed in a light most favorable to the non-moving party. *Waukegan Potawatomi Casino, LLC v. City of Waukegan*, 128 F.4th 871, 873 (7th Cir. 2025).

As noted briefly above, there was a video recording of the events described above but it is far from decisive. The recording appears to be filmed by a pole-mounted camera near the intersection and captures the sequence of events from a distance. It is in the record three times over—as Brandy's Exhibit H [DE 122-9], the City's Exhibit 7 [DE 130 at 4], and Garcia's Exhibit 5 (designated as the "Pole Cams Video") [DE 114 at ¶5.] Both sides rely on it, and each says it shows something different. The City maintains that the footage "speaks for itself and constitutes the full video footage of the pre-occurrence, occurrence, and post-occurrence events" [DE 135, Answer to ¶102.], and that it shows Winston continuing "to accelerate after [his car] rammed into the squad SUV" [DE 130 at 4]. Officer Garcia responds to Brandy's factual assertions with the objection that "the video more accurately depicts what transpired at the referenced times and places." [DE 138.] Brandy cites the recording to claim that the Impala never moved after the collision. [DE 122, Resp. to ¶52.]

I raise this issue because video evidence is afforded special consideration at summary judgment. "When video footage firmly settles a factual issue, there is no

genuine dispute about it, and we will not indulge stories clearly contradicted by the footage. Of course, videos are sometimes unclear, incomplete, and fairly open to varying interpretations." *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018). I've reviewed the video and cannot conclude that it contradicts either side. The recording does not appear to show the Impala moving, but that means little in light of the video's quality. The footage is shaky, lacks audio, and is shot too far from the intersection for me to wholly credit either side of the story. Because the footage does not blatantly contradict either account, the ordinary summary judgment rule applies, and I construe the record in the light most favorable to Brandy. See *Scott v. Harris*, 550 U.S. 372, 379-81 (2007).

**Discussion**

There are several issues to resolve on Defendants' motions for summary judgment. As to Officer Garcia, I must determine whether Brandy's excessive force claim and Garcia's qualified immunity defense must go to a jury. For the reasons explained below, I find that they do. For the City, I address whether Brandy's assault and battery claims can proceed or if the defendant is entitled to immunity under Indiana law. Whether the ITCA immunizes the City is a question for me to decide, not the jury, but the answer depends on a factual issue I cannot resolve on this record, so these claims likewise must go to a jury. Lastly, I address Brandy's and the City's motions to strike embedded in their responses to each other's Local Rule 56-1 Statements of Material Fact. These are denied as improper and unnecessary.

**I.    Garcia is Not Entitled to Summary Judgment as a Matter of Law on Brandy's Excessive Force Claim**

Officer Garcia claims that the undisputed evidence demonstrates as a matter of law that shooting into Winston's vehicle was reasonable under the circumstances. Section 1983 permits suit against individuals who, while acting under color of law, deprive another of a right secured by the Constitution or federal law. 42 U.S.C. § 1983. As this language suggests, to succeed on her Section 1983 excessive force claim, Brandy must prove two elements: "(1) the party against whom the claim is brought qualifies as a 'person acting under the color of state law'; and (2) the conduct alleged amounted to a deprivation of rights, privileges, or immunities under the Constitution or the laws of the United States." *Tom Beu Xiong v. Fischer*, 787 F.3d 389, 397 (7th Cir. 2015) (citation omitted). The defendants do not dispute that Garcia was acting under color of law during the incident, so the only issue is whether his actions deprived Brandy of any constitutional rights.

The right at issue here is the Fourth Amendment's protection against unreasonable searches and seizures. This Fourth Amendment right applies to, and limits, the amount of force that law enforcement may use on an individual. *See Stainback v. Dixon*, 569 F.3d 767, 771–72 (7th Cir. 2009). "When an officer is accused of using excessive force, the decisive question is whether the officer's conduct meets the Fourth Amendment's objective standard of reasonableness." *United States v. Brown*, 871 F.3d 532, 536 (7th Cir. 2017).

This reasonableness inquiry requires me to examine the "specific circumstances of

the arrest," including: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 519 (7th Cir. 2012). In doing so, I must consider "the amount and quality of the information known to the officer at the time." *Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020)

The totality of the circumstances is not an exercise in Monday morning quarterbacking. Instead, the test recognizes that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397. The inquiry is objective and "does not take into account the motives or intent of the individual officers." *Phillips*, 678 F.3d at 520.

The first factor of the reasonableness inquiry is the severity of the crime at issue. The record provides several candidates for offenses—a blown stop sign, evading arrest, fictitious plates, a stolen vehicle, and, of course, the defendants' claim that Winston used his vehicle as a weapon against Officer Verduzco. What matters here is what was known to Officer Garcia at the time, including the "severity of the crime prompting the stop." *Barnes v. Felix*, 605 U.S. 73, 80 (2025).

Garcia testified that he understood the purpose of the stop to be "a possible stolen vehicle or fictitious plates." [DE 122-2 at 5.] I'd hardly consider those to be the types of offenses that justify deadly force. Winston's use of his vehicle as a "weapon," as

8

defendants characterize it, is much graver. [*See* DE 112 at 4; DE 116 at 7.] A violent felony of that sort ordinarily would weigh heavily in favor of serious force. The difficulty for the defendants is that this serious crime is the very thing the record does not establish. Whether Winston intentionally rammed the squad car and kept accelerating, or whether, as Brandy's evidence suggests, Winston had no intention of hitting the SUV and his Impala sat stopped after the collision is genuinely disputed. It is the same dispute of material fact that drives the threat analysis below.

The second factor — the immediate threat to the officers or others — rises or falls on the same disputed conduct I just described. The defendants' whole position that deadly force was reasonable rests on a single premise — that after the collision the Impala (the car Winston and Brandy were driving in) kept accelerating while Officer Verduzco's leg was pinned between the police vehicle and the Impala. On one side stand Officers Garcia, Verduzco, and Tipton, who each testified that the engine kept revving after the collision while Verduzco's leg was pinned. [DE 114-2 at 35; DE 114-3 at 41; DE 114-4 at 40-41.] On the other, stands Brandy's evidence, which includes the testimony of the only uninvolved witness, Glen Weaver, that the Impala never moved after the collision [DE 122-13 at 6], and the matching accounts of Winston and Brandy that the car stopped and they put their hands up in surrender. [DE 122-5 at 4; DE 122-6 at 21, 25.] Garcia and Verduzco testified that Brandy posed no threat at any point on the day of the shooting. [DE 123-6 at 9; DE 123-7 at 6.] It's hard for me to imagine a more tailor-made jury question. When crediting the evidence in the light most favorable to Brandy, a

9

reasonable jury could find that Winston's car, and surely Brandy, did not pose a threat when Officer Garcia fired his weapon.

For the same reason, defendants don't score any points on the third factor, active resistance or flight. While defendants claim Winston was evading arrest [DE 113 at ¶8; DE 117 at ¶46], Brandy testified that Winston was not actively fleeing when the police turned on their lights. [DE 122, Resp. to ¶46; DE 123-5 at 18-19.] Construed in a light most favorable to Brandy, the evidence suggests she and Winston were in a stopped vehicle surrendering to the police when Officer Garcia came out (quite literally) guns blazing. Even if they were attempting an escape prior to the collision, "significant force is unreasonable after a suspect has stopped resisting or evading arrest." *Alicea v. Thomas*, 815 F.3d 283, 288 (7th Cir. 2016); *see also Becker v. Elfreich*, 821 F.3d 920, 929 (7th Cir. 2016) (recognizing that "the caselaw clearly establishes that an officer cannot use more than minimal force" on what was "at most a passively resisting suspect.")

As defendants repeatedly requested in their briefs, and as I noted above, I take care to judge the situation "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396. But the fact that decides this case is genuinely disputed. I therefore cannot resolve it on paper. The core of this dispute is whether Winston's car was moving and crushing Verduzco's leg after the collision. When a suspect is alleged to have used his vehicle as a weapon against police, the movement of that vehicle is a key consideration. Although a car driven at an officer can justify deadly force, the officer's self-defense rationale "would be significantly

weakened" if the shots were fired while the vehicle was moving away rather than toward him. *Scott v. Edinburg*, 346 F.3d 752, 758 (7th Cir. 2003). Where the vehicle doesn't pose a threat to the officer, and the suspect signals surrender, the self-defense rationale falters even more. See *Strand v. Minchuk*, 910 F.3d 909, 916 (7th Cir. 2018) (recognizing that a Fourth Amendment violation occurs when an officer, without warning, shoots an unarmed offender who is "not fleeing, actively resisting, or posing an immediate threat to the officer or the public").

There is a further wrinkle the defendants' briefing passes over. Brandy was not the driver; she was an unarmed passenger. Garcia's account is that he fired towards the threat he perceived—Winston and the car—and learned that a second occupant was inside only "after the fact." [DE 117 at ¶¶ 69-70, 72] In this situation, the use of force must be reasonable as to Brandy, and defendants have not shown that it was.

*Estate of Davis v. Ortiz* is close to this point. There, an officer fired into a moving car and struck a passenger, and the Seventh Circuit explained that whether the officer fired at the vehicle and its occupants generally, without regard to who was inside, or instead aimed only at the driver, is a material fact bearing on the reasonableness of the force. *Est. of Davis v. Ortiz*, 987 F.3d 635, 640 (7th Cir. 2021)

That same question is disputed here. Garcia fired "towards the driver" in order to "stop the threat," and that threat "was the vehicle in which he later learned contained two people." [DE 114-4 at 43; DE 117 at ¶¶ 69-70, 72.] Brandy says the cars faced one another before the collision, the Impala's front windshield was not tinted, and Verduzco

11

could see through it well enough to describe Winston's facial expression. This is all evidence from which a jury could infer that Officer Garcia could see the front seat (and therefore Brandy) as well. [DE 122 at ¶ 109, Resp. to ¶72.] What's more, on Brandy's account of things, Garcia stood beside the front passenger window and fired through it, striking her three times. [DE 122 at ¶¶ 110, 114.] On this record, I cannot say as a matter of law either that a reasonable officer in Garcia's position would not have known a passenger was in the front seat, or that firing through the passenger window without regard to who was inside was reasonable as to Brandy.

The parties disagree on the facts relevant to just about every factor I must consider in evaluating Officer Garcia's use of force. It will be up to a jury to sort out these factual disputes and determine whether Garcia's use of force was objectively reasonable. *See Catlin v. City of Wheaton*, 574 F.3d 361, 367 (7th Cir. 2009) (noting that "[s]ummary judgment is often inappropriate in excessive force cases" because "the parties typically tell different stories about what happened.").

## II. Garcia is Not Entitled to Qualified Immunity on This Record

For many of the same reasons, the Officer Garcia's request to dismiss the case on qualified immunity grounds must likewise be denied. [DE 112 at 5.] Qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity 'gives

government officials breathing room to make reasonable but mistaken judgments about open legal questions,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (internal citation omitted).

Evaluation of a qualified immunity defense is a two-step inquiry: "(1) whether the facts alleged or shown by the plaintiff establish a violation of a constitutional right, and (2) if so, whether that right was clearly established at the time of the defendant's alleged misconduct." *Dockery v. Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018). There need not be "a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018).

Beginning with the second step, the events in question took place in August 2021. Taking the facts in the light most favorable to Brandy, as I must at this stage, by August 2021 it was clearly established that an officer may not use deadly force against an occupant of a stopped vehicle who is not fleeing, not actively resisting, and poses no immediate danger to the officer or the public. *Strand v. Minchuk,* 910 F.3d 909, 916 (7th Cir. 2018); *see also Est. of Davis v. Ortiz*, 987 F.3d 635, 640-42 (7th Cir. 2021); *Scott v.*

*Edinburg*, 346 F.3d 752, 758 (7th Cir. 2003). On Brandy's version of the events, this is the case.

As with the above analysis of the reasonableness of Officer Garcia's use of force, I cannot decide on this record as a matter of law that Brandy will not be able to establish a violation of this constitutional right. The same analysis that I used above for the excessive force claim applies to consideration of Garcia's request for qualified immunity. *See Sheehan v. Noble Cnty. Sheriff's Dep't.*, 2016 WL 7100555, at *13 (N.D. Ind. Dec. 6, 2016) ("The Defendants' argument for qualified immunity is based on the assumption that the force used against [the plaintiff] was reasonable under the circumstances. But since the Court cannot make that assumption, it likewise cannot conclude that Defendants are entitled to qualified immunity. If a jury finds that any of the Defendant officers are liable for excessive force, then by definition they would not be entitled to qualified immunity."). Based on the current record, Officer Garcia is not entitled to summary judgment on the basis of qualified immunity.

**III.    The City is Not Entitled to Summary Judgment on Brandy's Assault and Battery Claims**

As a preliminary matter, Brandy clarified that her excessive force claim is against Officer Garcia only and her tort claims are against the City only. [DE 122, Resp. to ¶80; DE 128 at 18-19.] In her complaint, she asserted assault and battery claims against the City for the officer defendants' actions under the theory of *respondeat superior.* [*See* DE 1 at ¶6.] Brandy alleges, as the basis of her tort claims, that Garcia intentionally rammed his squad car into Winston's vehicle, got out of his car, and shot her. [*See id.* at ¶¶ 41-44.]

On August 17, 2021, Brandy's counsel sent what appear to be evidence-preservation letters to East Chicago's mayor, corporate counsel, and police chief. [DE 122-17.]  The initial question that I must answer is whether these letters from Brandy's counsel satisfy the notice requirement under the Indiana Tort Claims Act (ITCA). It is a close question, and Brandy didn't help me much with her shoddy briefing on the issue. Nevertheless, for the reasons detailed below, I find that the notice requirement has been met in this case.

The ITCA provides that a claim against a political subdivision is barred unless notice is filed with the governing body of that political subdivision within 180 days after the claimant's loss occurs. Ind. Code § 34-13-3-8. Furthermore, the notice must include a short and plain statement of the facts on which the claim is based, including the circumstances which brought about the loss, the extent of the loss, the time and place the loss occurred, the names of all persons involved (if known), the amount of damages sought, and the residence of the person making the claim at the time of the loss and the notice. Ind. Code § 34-13-3-10.

The City does not dispute whether Brandy's counsel sent the notice to the right officials. Nor do they contend that the letters were not timely sent. Instead, the City says Brandy's letters are preservation-of-evidence demands and "nothing more," and are lacking the statute's required content [DE 116 at 8; DE 130 at 9-10.]

Whether Brandy complied with the notice requirement is a question of law that I must decide. *See Indiana State Highway Comm'n v. Morris*, 528 N.E.2d 468, 471 (Ind. 1988);

15

The ITCA does not require strict compliance with the notice requirements; substantial compliance suffices so long as the purpose of the notice requirement is satisfied. *Madison Consol. Schs. v. Thurston*, 135 N.E.3d 926, 929 (Ind. Ct. App. 2019). A party satisfies the purpose of the notice requirement if "the notice supplied by the claimant of his intent to take legal action contains sufficient information for the city to ascertain the full nature of the claim against it so that it can determine its liability and prepare a defense." *Collier v. Prater*, 544 N.E.2d 497, 500 (Ind. 1989). The subjective motive for sending the letters is neither here nor there.  In other words, it doesn't matter in this case that the prime reason for sending the letters was to inform East Chicago to preserve evidence. Instead, what matters is the content of the letters and whether they provide the putative defendant with the notice to which they are entitled.

Measured against the statute, the letters supply a good deal more than the City's briefing lets on. Each of Brandy's three letters—sent by certified mail to Mayor Anthony Copeland, Corporation Counsel Carla Morgan, and Police Chief Hector Rosario—opens by identifying the claimant and the occurrence: "My firm represents Heavenly Brandy a young woman who was shot by East Chicago police on August 11, 2021." [DE 122-17 at 2.][1] Each then specifies, in bold type, that the evidence to be preserved relates to "the police shooting of Ms. Brandy on August 11, 2021 at approximately 8:45 a.m. at or near the intersection of Indianapolis Boulevard and West Chicago Avenue in East Chicago, Indiana."[*Id*. at 3.] Each letter expressly states that "[t]his shooting is likely to be the

---

[1] The three letters are substantively identical, so I only cite to the first letter, but my descriptions apply to all three. [*See* DE 122-17.]

16

subject of litigation" and it makes clear that East Chicago Police Department officers were involved. [*Id.* at 2.] The letters were delivered by certified mail, exactly as the Act requires, and return receipts show delivery on August 20, 2021, well within the 180-day window. [*Id* at 4.]

The City does not contend that the letters were sent to the wrong officials; rather, it argues the letters "fail to specify the time and location of the shooting." [DE 130 at 11.] That argument leaves me a bit slack jawed. The letters *specifically identify* the date, the approximate time, and the intersection where the incident occurred, and in boldface no less. [DE 122-17 at 2-3.] The City points to the fact that the sole topic of the letters was descriptions of the types of evidence to be preserved. [DE 130 at 10.] But a letter that tells the city who was hurt, by whom, when, where, and that litigation is in the offing can't be deemed to be insufficient notice simply because it also asks the city to preserve evidence.

I find that Brandy's letters serve the purpose of the ITCA notice requirement. In *Collier v. Prater*, the Supreme Court of Indiana found a letter sent by the plaintiff's attorney to the city legal department, the clerk, and the chief of police satisfied the notice requirement because it identified the claimant, stated an intent to seek damages, noted the damages were for injuries received during an arrest, identified the officers involved, and explained that the full extent of his damages could not be determined. *Collier*, 544 N.E.2d at 500. Of note, the letter in *Collier* did not even explain the place or date of the injury, but the Court found substantial compliance anyway because "[t]he city needed only to contact the officers involved or the police department" to obtain this information.

17

*Id*.

Like the letter in *Collier*, Brandy's letters name the claimant, describe the occurrence, and expressly announce an intention to litigate. I acknowledge that there are gaps in Brandy's letters.  They make no mention of her damages, provide no residence, and say nothing about the nature or extent of her injuries beyond the fact that she was shot. Those are three of the items the statute lists, and their absence isn't meaningless. *See* Ind. Code § 34-13-3-10. Indeed, information about the injury and damages helps an entity to evaluate potential liability for a claim. *See Collier*, 544 N.E.2d at 500. But the question is not whether Brandy checked every box; it's whether the statute's purpose was served under the facts of the case. *Id*. As to the missing damages issue, even the plaintiff in *Collier* could not provide an estimate of his damages, and while that plaintiff did explain he suffered injuries as a result of his arrest, surely the City of East Chicago could assume the same of Brandy, who is identified in her letters as a "young woman *who was shot* by East Chicago police." *See id.*; [DE 122-17 at 2] (emphasis added).  Brandy sent her notice letters within a week of the incident and could only be expected to know so much about the extent of her injuries and potential damages at that time. She should not be penalized for promptly providing notice. As to her missing residence information, the City offers no explanation as to how this could prejudice its investigation or evaluation of the claim, and I don't see how it would in this case.

These omissions do not defeat compliance. *Collier* forecloses the checklist approach on which the City's argument depends, noting that "what information suffices will vary

depending on the facts of each case." *Id.* at 500. On the facts of this case, I find that Brandy's letters provided sufficient information to satisfy the purpose of the notice requirement.

Finally, the City invokes law enforcement immunity under Ind. Code § 34-13-3-3(a)(8), which immunizes governmental entities or an employee acting within the scope of his employment for losses resulting from the enforcement of a law. The City's argument is straightforward: Garcia was enforcing the law and acted reasonably when he drove his car in front of Winston's and fired his weapon in defense of Verduzco. [*See* DE 116 at 9; DE 130 at 12.] But under Indiana law, "if an officer uses unnecessary or excessive force, the officer may commit the torts of assault and battery." *Fabiszak v. Town of Cedar Lake*, 804 F. Supp. 3d 819, 844 (N.D. Ind. 2025) (citing *Wilson v. Isaacs*, 929 N.E.2d 200, 203 (Ind. 2010)). Because "Indiana's excessive force standard effectively parallels the Fourth Amendment standard," *id.*, the state law question is answered by the federal one, and for the reasons discussed above, only a jury can answer that question in this case.

The City adds another argument directed particularly to the battery claim, asserting that no officer intended to make harmful or offensive contact with Brandy. [DE 116 at 9.] That contention is contested on the record, and I have already addressed it. The City says that Garcia fired his weapon "towards the driver" in order to "stop the threat and the threat was the vehicle in which he later learned contained two people." [DE 117 at ¶¶ 69-70, 72] Brandy contends that "Garcia intentionally shot at the Impala without regard to who was inside the vehicle." [DE 122 at ¶107.] As I explained earlier, whether

Garcia knew or should have known that Brandy occupied the front seat is disputed [*see* DE 122 at ¶¶ 107, 109-11], and a jury crediting her evidence could find that he fired at the car and its occupants generally rather than at the driver alone. *See Est. of Davis v. Ortiz*, 987 F.3d 635, 640-42 (7th Cir. 2021); *Fabiszak*, 804 F. Supp. 3d at 844 (N.D. Ind. 2025) (denying summary judgment on the plaintiff's assault and battery claims where genuine disputes of material fact existed as to whether an officer's use of force was objectively reasonable).

That leaves the assault claim. The City argues that the claim fails because the officers "took no action with the intent to create an apprehension of imminent harmful or offensive contact as it specifically relates to Brandy." [DE 116 at 10.] This argument rests on the same disputed premise I have already rejected. Whether Garcia fired at the driver alone or at the car and its occupants generally, without regard to who was inside, is genuinely disputed. *See Est. of Davis*, 987 F.3d at 640. Crediting Brandy's evidence—that she was visible before the collision and Garcia stood beside the passenger window and fired through it—a jury could find that he intended contact with whoever occupied that seat. The City cannot obtain summary judgment on a factual assumption the record does not permit me to make. As a result, the City is not entitled to summary judgment on Brandy's assault and battery claims.

## IV.   The Parties' Motions to Strike are Denied.

Both sides have tucked motions to strike in their Local Rule 56-1 filings. Brandy's are found in her responses to the defendants' statements of material facts [DE 122; DE

20

123.] The City's are embedded in its responses to Brandy's statement of additional material facts. [DE 135.]

First, I deny them on a procedural point. A motion to strike reaches only a pleading, Fed. R. Civ. P. 12(f), and a statement of material fact under Local Rule 56-1 is not a pleading. *See* Fed. R. Civ. P. 7(a). The proper vehicle for an evidentiary objection at this stage is Rule 56, which lets a party "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Furthermore, L.R. 56-1(f) provides that "[d]isputes about the admissibility or materiality of evidence must be raised in the parties' briefs." Neither party included their objections in a brief.

Second, I need not catalogue each objection included in the parties' filings or address the merits of them. "[I]t is the function of a court, with or without a motion to strike, to review carefully both statements of material facts and statements of genuine issues and the headings contained therein and to eliminate from consideration any argument, conclusions, and assertions unsupported by the documented evidence of record offered in support of the statement." *Mayes v. City of Hammond*, 442 F. Supp.2d 587, 596 (N.D. Ind. 2006). I've reviewed each objection and can assure the parties that I did not rely upon the statements to which the parties objected.  Instead, I've relied upon the facts that are supported by record evidence and the relevant case law in coming to my conclusions in this Opinion.

**Conclusion**

21

For the aforementioned reasons, Defendants Gustavo Garcia and Unidentified East Chicago Police Officers' Motion for Summary Judgment [DE 111] is **DENIED** as to Count I (42 U.S.C. § 1983 – Excessive Force) and **GRANTED** as to Count II (Failure to Intervene). Defendant Unidentified East Chicago Police Officers is **DISMISSED** from this case.

Defendant City of East Chicago's Motion for Summary Judgment [DE 115] is **DENIED** as to Counts III (assault) and IV (battery).

The Parties' Motions to Strike included in Responses to Statements of Materials Facts [DE 122; DE 123; DE 135] are **DENIED**.

ENTERED: July 24, 2026

s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT